Nos. 20-16727, 21-15928

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SWISHER HYGIENE FRANCHISE CORP.; SWISHER HYGIENE INC.; SWISHER INTERNATIONAL, INC.,

Plaintiffs-Appellees,

v.

ACCURATE CHEMICAL ACQUISITION INCORPORATED, d/b/a ACCURATE CHEMICAL & SERVICES,

Defendant-Appellant,

and

DAVID T. BARTON; KATYA M. LANCERO; BURNSBARTON PLC,

Intervenors-Appellants.

On Appeal from the United States District Court
for the District of Arizona
No. 2:15-cv-01331-PHX-DJH

## BRIEF OF APPELLEES

Pavneet Singh Uppal
 *Counsel of Record*
Kris Leonhardt
Benjamin S. Morrell

FISHER & PHILLIPS, LLP
3200 N. Central Avenue
Suite 1550
Phoenix, AZ 85012
(602) 281-3400
puppal@fisherphillips.com

*Counsel for Appellees*

## <u>Disclosure Statement</u>

Appellee Swisher Hygiene Franchise Corp. is 100% owned by Appellee Swisher International, Inc. Swisher International, Inc. is 100% owned by Appellee Swisher Hygiene Inc. Swisher Hygiene Inc. is 100% owned by Ecolab Inc. Ecolab Inc. is a publicly traded company (NYSE: ECL). *See* Fed. R. App. P. 26.1(a).

i

# Table of Contents

Disclosure Statement.........................................................................i

Table of Contents ...........................................................................ii

Table of Authorities .......................................................................v

Statement Regarding Oral Argument ...........................................x

Statement Regarding Jurisdiction .................................................1

Questions Presented .......................................................................2

Statement of Facts and Proceedings Below ..................................3

    I.  ACS hires Swisher employee Clawson as a Business Development Executive...............................................................................3

    II.  Swisher files suit against ACS and Clawson and then moves for sanctions...........................................................................5

    III.  Swisher discovers the Southern Arizona Plan and files a second motion for sanctions. ..............................................8

    IV.  The district court holds an evidentiary hearing...................11

    V.  The district court imposes sanctions on Defendants and their attorneys. .........................................................................15

    VI.  The district court awards fees and damages........................20

Summary of the Argument ...........................................................22

Argument.......................................................................................25

    I.  The Default Judgment Against ACS....................................25

      A.  Standard of review .........................................................25

      B.  Legal standards...............................................................25

      C.  The district court correctly held ACS responsible for the misconduct of its attorneys and its Senior Business Development Executive, Clawson. ..............................26

        1.  ACS had direct knowledge of Clawson's misconduct and lied to the district court..................................................28

        2.  ACS is responsible for Clawson's misconduct. .............29

        3.  ACS is responsible for BurnsBarton's conduct. ............31

    II.  The Sanctions Against BurnsBarton ...................................33

  A. Standard of review ............................................................ 33

  B. The district court's findings of fact are not clearly erroneous. ............ 33

  C. BurnsBarton received due process. ................................... 38

      I.  BurnsBarton had prior notice that Swisher sought Barton's and Lancero's testimony at the hearing and that their actions and misconduct were at issue. ............................ 39

      2.  The district court gave BurnsBarton the opportunity to be heard. . 42

III. The Fee Award ............................................................ 43

  A. Standard of review ............................................................ 43

  B. The fee award as to ACS ................................................... 44

  C. The fee award as to BurnsBarton ...................................... 44

      1.  The district court did not abuse its discretion by imposing joint and several liability on the fee award. ................................ 44

      2.  The district court made clear that the second fee award was an additional compensatory award. ................................ 46

IV. The Compensatory Damages Award ................................. 50

  A. Standard of review ............................................................ 50

  B. Legal standard ................................................................ 50

  C. ACS's causation arguments are not properly before this Court. ......... 51

  D. The compensatory damages award was amply supported and not "speculative." ................................................................ 52

  E. The district court correctly sustained relevance objections to ACS's causation evidence. ........................................................ 54

  F. The district court gave ACS sufficient time to present evidence at the damages hearing. ........................................................ 56

  V.  The Punitive Damages Award ......................................... 59

  A. Standard of review ............................................................ 59

  B. Arizona law on punitive damages ..................................... 59

  C. The record contains ample support for the punitive damages award. . 60

  D. The district court based the punitive damages award solely on Defendants' relevant misconduct ...................................... 65

Conclusion ................................................................ 68

Certificate of Compliance ............................................................... 70

Certificate of Service ...................................................................... 72

FP 42462809.3

# Table of Authorities

| **Cases** | **Pages** |
|---|---|

*Adriana Int'l Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990) ............................................................ 45, 55

*Alutiiq Int'l Sols., LLC v. OIC Marianas Ins. Corp.*,
149 F. Supp. 3d 1208 (D. Nev. 2016) ..................................................... 60

*Am. Republic Ins. Co. v. Union Fid. Life Ins. Co.*,
470 F.2d 820 (9th Cir. 1972) ............................................................. 63, 64

*Anderson v. Bessemer City*,
470 U.S. 564 (1985) ................................................................................ 34

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
69 F.3d 337 (9th Cir. 1995) ..................................................................... 19

*Atias v. Sedrish*,
133 F. App'x 759 (2d Cir. 2005) .............................................................. 50

*Awon v. United States*,
308 F.3d 133 (1st Cir. 2002) .................................................................... 42

*Baker v. Latham Sparrowbush Assocs.*,
72 F.3d 246 (2d Cir. 1995) ................................................................ 28, 29

*BCS Servs., Inc. v. Heartwood 88, LLC*,
637 F.3d 750 (7th Cir. 2011) ................................................................... 50

*Chambers v. Farm Workers Org. Comm.*,
541 P.2d 567 (Ariz. Ct. App. 1975) ........................................................ 58

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .................................................................................. 26

*Cutcliff v. Reuter*,
791 F.3d 875 (8th Cir. 2015) ................................................................... 49

*Danning v. Lavine*,
572 F.2d 1386 (9th Cir. 1978) ................................................................. 50

*Desert Palm Surgical Grp., P.L.C. v. Petta*,
    343 P.3d 438 (Ariz. Ct. App. 2015) .......................................................... 59

*Engler v. Gulf Interstate Eng'g, Inc.*,
    280 P.3d 599 (Ariz. 2012) ........................................................................ 30

*Fair Hous. of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002) ................................................................... 58

*FTC v. Cottelli*,
    854 F. App'x 837 (9th Cir. 2021) ............................................................ 28

*Garden City Boxing Club, Inc. v. Aranda*,
    384 F. App'x 688 (9th Cir. 2010) ............................................................ 57

*Geddes v. United Fin. Grp.*,
    559 F.2d 557 (9th Cir. 1977) ................................................................... 49

*In re George*,
    322 F.3d 586 (9th Cir. 2002) ................................................................... 46

*Goodyear Tire & Rubber Co. v. Haeger*,
    137 S. Ct. 1178 (2017)............................................................20, 43, 48, 49

*Hale v. U.S. Tr.*,
    509 F.3d 1139 (9th Cir. 2007)................................................................. 33

*Haralson v. Fisher Surveying, Inc.*,
    31 P.3d 114 (Ariz. 2001) ......................................................................... 66

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008)................................................................. 54

*Hawkins v. Allstate Ins. Co.*,
    733 P.2d 1073 (Ariz. 1987)....................................................58, 63, 65, 67

*Hawks v. Seery*,
    No. CV-21-00092-PHX-DGC, 2021 WL 2209045 (D. Ariz.
    June 1, 2021) ........................................................................................... 60

*Hayes v. SkyWest Airlines, Inc.*,
    12 F.4th 1186 (10th Cir. 2021)................................................................ 67

FP 42462809.3

*Hilao v. Estate of Marcos*,
103 F.3d 762 (9th Cir. 1996) ..................................................... 25

*HTS, Inc. v. Boley*,
954 F. Supp. 2d 927 (D. Ariz. 2013) ............................. 50, 52, 60

*Hyde & Drath v. Baker*,
24 F.3d 1162 (9th Cir. 1994) ..................................................... 45

*In re IVDS Interactive Acquisition Partners*,
302 F. App'x 574 (9th Cir. 2008) ............................................. 44

*Marriage of Kline v. Kline*,
212 P.3d 902 (Ariz. Ct. App. 2009) ..................................... 60, 62

*Kode v. Carlson*,
596 F.3d 608 (9th Cir. 2010) (per curiam) ............................... 67

*KPS & Assocs. v. Designs by FMC, Inc.*,
318 F.3d 1 (1st Cir. 2003) ......................................................... 57

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ............................................. 25, 38

*Link v. Wabash R.R. Co.*,
370 U.S. 626 (1962) ..................................... 20, 25, 32, 40

*M.M. v. Lafayette Sch. Dist.*,
681 F.3d 1082 (9th Cir. 2012) ................................................... 57

*Malone v. U.S. Postal Serv.*,
833 F.2d 128 (9th Cir. 1987) ..................................................... 32

*Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*,
50 F.3d 730 (9th Cir. 1995) ....................................................... 25

*Martinez v. Aero Caribbean*,
764 F.3d 1062 (9th Cir. 2014) ................................................... 29

*McClure v. Country Life Ins. Co.*,
326 F. Supp. 3d 934 (D. Ariz. 2018) ......................................... 66

vii

*McConnell v. Wal-Mart Stores, Inc.*,
    650 F. App'x 520 (9th Cir. 2016) ............................................................ 56

*Medasys Acquisition Corp. v. SDMS, P.C.*,
    55 P.3d 763 (Ariz. 2002) ........................................................................ 59

*Nostalgia Network, Inc. v. Rayle*,
    56 F. App'x 344 (9th Cir. 2003) ............................................................. 26

*Ohio State Univ. v. Redbubble, Inc.*,
    989 F.3d 435 (6th Cir. 2021) .................................................................. 27

*Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*,
    210 F.3d 1112 (9th Cir. 2000) ............................................................ 38, 42

*Payne v. Norwest Corp.*,
    185 F.3d 1068 (9th Cir. 1999) ................................................................ 54

*Pumphrey v. K.W. Thompson Tool Co.*,
    62 F.3d 1128 (9th Cir. 1995) .................................................................. 33

*Roadrunner Transp. Servs., Inc. v. Tarwater*,
    No. SACV-10-1534-AG-(MLGx), 2013 WL 12171729 (C.D.
    Cal. Aug. 9, 2013) .................................................................................. 51

*Rozario v. Richards*,
    687 F. App'x 568 (9th Cir. 2017) ........................................................... 49

*Stanford Ranch, Inc. v. Md. Cas. Co.*,
    89 F.3d 618 (9th Cir. 1996) .................................................................... 27

*Stephenson v. El-Batrawi*,
    524 F.3d 907 (8th Cir. 2008) .................................................................. 51

*Thompson v. Better-Bilt Aluminum Prod. Co.*,
    832 P.2d 203 (Ariz. 1992) ................................................................... 59, 63

*Tutor-Saliba Corp. v. City of Hailey*,
    452 F.3d 1055 (9th Cir. 2006) ................................................................ 43

*United States v. Bagley*,
    837 F.2d 371 (9th Cir. 1988) .................................................................. 54

FP 42462809.3

*United States v. Beraun-Panez*,
   812 F.2d 578 (9th Cir.), *modified*, 830 F.2d 127 (9th Cir. 1987) ................. 55

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009) (en banc).................................................... 33

*United States v. Ortega-Ascanio*,
   376 F.3d 879 (9th Cir. 2004) .................................................................... 49

*United States v. Stonehill*,
   660 F.3d 415 (9th Cir. 2011) .................................................................... 29

*Wyle v. R.J. Reynolds Indus., Inc.*,
   709 F.2d 585 (9th Cir. 1983) .................................................................... 26

*Yang v. Hardin*,
   37 F.3d 282 (7th Cir. 1994) ...................................................................... 50

## Other Authorities

9th Cir. R. 28-2.2........................................................................................ 1

Fed. R. Civ. P. 37(e)................................................................................. 26

Fed. R. Civ. P. 52(a)(6) ............................................................................ 25

Fed. R. Civ. P. 55(c)............................................................................27, 51

Fed. R. Civ. P. 59(e)................................................................................. 22

Fed. R. Evid. 103(a)(2) ............................................................................ 54

FP 42462809.3

## Statement Regarding Oral Argument

Appellees respectfully suggest that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument. *See* Fed. R. App. P. 34(a); 9th Cir. R. 34-4(2).

FP 42462809.3

## Statement Regarding Jurisdiction

Appellees admit this Court has jurisdiction over this appeal. *See* 9th Cir.

R. 28-2.2.

# Questions Presented

1.    Corporations can only act through their agents. The district court found Defendant Clawson acted to further the interest of his employer, Defendant ACS, when he "engaged in a fraud on the [c]ourt" by lying under oath about and destroying evidence concerning his joint plan with ACS to steal Plaintiffs' customers and employees. It also found Defendants' attorneys acted for Defendants' benefit when defense counsel "facilitated and continued to cover up Clawson's fraud and their own irresponsible conduct." Did the district court abuse its discretion by sanctioning ACS?

2.    Courts have inherent authority to sanction lawyers practicing before them. The district court found defense counsel David T. Barton, Katya M. Lancero, and BurnsBarton PLC attempted to defile "the very temple of justice" by facilitating and concealing Clawson's fraud and perjury and by refiling his affidavit with a material alteration. It also found defense counsel knew about Clawson's possession and subsequent destruction of evidence and repeatedly lied about the evidence's existence to cover up Clawson's fraud and their own conduct. Did the district court abuse its discretion by sanctioning defense counsel?

3.    Courts may award attorney's fees to compensate a party for another's litigation misconduct. The district court awarded Plaintiffs a portion of their fees incurred because of Defendants' and their lawyers' misconduct. It issued a second, identical compensatory award after finding that defense counsel "intentionally misled the [c]ourt to cover-up or minimize the exposure of their client's misconduct" and that Defendants engaged in "egregious conduct" making this an "exceptional

case." Did the district court abuse its discretion by awarding attorney's fees?

4.     Entry of a default judgment establishes liability, including causation, pleaded in the complaint. Plaintiffs presented evidence and testimony showing Defendants' actions cost it twenty-six customers. Did the district court abuse its discretion by awarding and calculating compensatory damages related to these customers and rejecting Defendants' causation evidence?

5.     Under Arizona law, a punitive damages award requires clear and convincing evidence of an "evil mind" and conduct over and above a typical tort. The district court found the record contained overwhelming evidence of Defendants' premeditated corporate raiding scheme directed at Plaintiffs and their repeated attempts to conceal their actions from Plaintiffs and the court. Did the district court abuse its discretion by awarding punitive damages?

## Statement of Facts and Proceedings Below

### I.     ACS hires Swisher employee Clawson as a Business Development Executive.

Appellees (collectively, "Swisher") are in the business of commercial hygiene products and services. (1-SER-155.) In 2011, Swisher bought ProClean, Inc., another company in the industry, and hired Troy Clawson, a longtime Pro-Clean employee in Arizona. (1-SER-155, 161.) Clawson and Swisher executed a Confidentiality and Noncompete Agreement containing restrictive covenants preventing him from retaining or misusing Swisher's confidential business

information were he to leave Swisher. (1-SER-161.)

Clawson resigned from Swisher in June 2015 to work for Accurate Chemical Acquisition, Inc., d/b/a Accurate Chemical & Services ("ACS"), as a "Senior Business Development Executive." (1-SER-164–65.) Clawson's main objective was to develop business for ACS, and ACS's president and owner, Brad Zall, instructed Clawson to prepare a plan to develop ACS's business. (1-SER-168; 2-AccurateER-172.)

Thereafter, Clawson drafted three "Action Plans" over the course of a week: the Northern Arizona Plan, Phoenix Arizona Plan, and Southern Arizona Plan. (IER-648–50.[1]) The Action Plans included detailed lists of Swisher's "customers that we need to concentrate on" in each region—**identifying over 100 Swisher customers to ACS.** (IER-671–79; 1-SER-168–69.) The Plans were rife with Swisher's confidential business information, including:

- customer contact persons;
- identification of Swisher representatives assigned to customer accounts;
- approximate values for the accounts;
- products used;
- pricing offered;

---

[1] Intervenors' Excerpts of Record uses the format "ER-000." To better differentiate between it, Appellant's Excerpts of Record, and Appellees' Supplemental Excerpts of Record, Appellees cite to it as "IER-000."

- whether the pricing was aggressive or competitive;

- whether machines were leased, loaned, or owned, and the specific types of machines used;

- whether the customers were experiencing service or other problems with Swisher;

- whether the customers were happy with the Swisher's services;

- whether Swisher provided certain customers with rebates;

- whether Swisher representatives assigned to customer accounts were vigilant against competitive activity;

- which Swisher employees ACS should hire; and

- how much ACS would have to pay individual Swisher employees to induce them to leave.

(IER-671–80; 1-SER-201–02.)

Clawson emailed the Phoenix and Northern Arizona Plans to Zall on June 11, 2015, stating: "Here is what I have come up with so far. This will be a good start. Also I am adding the salaries of the guys that we should bring over. I'll work on Southern Arizona tomorrow."[2] (IER-670.) Clawson then drafted the Southern Arizona Plan. (1-SER-168; *see* 3-SER-433.)

## II. Swisher files suit against ACS and Clawson and then moves for sanctions.

Swisher sued Clawson, his spouse, and ACS in Arizona state court and sought a preliminary injunction to prevent ACS's and Clawson's misuse of

---

[2] ACS shows a continued lack of candor by stating Zall only "discovered the June 11 Email" in "March 2016." (Appellant's Br. at 9.)

Swisher's confidential information. (2-SER-394–411, 418–31.) ACS removed. (2-SER-390–93.) Swisher's amended complaint pleaded claims for breach of fiduciary duty and the duty of loyalty against Clawson, aiding and abetting those breaches against ACS, unfair competition, conversion, breach of contract against Clawson, breach of the covenant of good faith and fair dealing against Clawson, and tortious interference with contractual and economic relations against ACS. (IER-553–59.) It requested injunctive relief against both. (IER-553–54.) ACS hired the law firm of Quarles & Brady LLP to represent it; Clawson hired David Barton and Katya Lancero of BurnsBarton PLC .[3] (IER-582–83.)

In August 2015, ACS filed its response to Swisher's preliminary injunction application, which included a perjured affidavit by Clawson. (IER-519–41.) Therein, Clawson stated under oath:

> 17 . . . I have not solicited Swisher customers either before or after I left Swisher, *nor have I identified any Swisher customers that ACS should go after.*

> 18. I am not in possession of any Swisher confidential information or property, nor did I ever provide any Swisher confidential information or property to anyone at ACS.

> 19. Further, ACS has informed me that they are not interested in having me solicit any Swisher employees or customers.

---

[3] Appellees refer to Intervenors collectively as "BurnsBarton" and the law firm specifically as "BurnsBarton PLC."

(IER-541 (emphasis added).) These statements were false. Clawson had identi-
fied over 100 Swisher customers to ACS in the Action Plans (which also con-
tained Swisher's confidential information) and emailed them to Zall in June.
(IER-074 (finding that Defendants "cannot reconcile" paragraph 19 above with
Clawson's statement in the June 11 email "that he would create customer service
lists that include Swisher customers.").)

Swisher later withdrew its preliminary injunction request at least in part
due to Clawson's perjured affidavit. (IER-514–18.) In April 2016, eight months
later, Barton and Lancero filed a notice of errata to "notify the Court of an error
appearing on page four in the Affidavit of Troy Clawson, which was filed in
support of [ACS's] Response in Opposition to Plaintiffs' Application for Prelim-
inary Injunction." (IER-508.) The new Clawson affidavit attached to the errata
notice was identical to the old one, except that the italicized portion quoted
above was now missing. (IER-513.) The notice did not alert the court that the
newly omitted statement was objectively false or even identify what changes had
been made. It merely stated: "Defendants have amended the Affidavit of Troy
Clawson, and it is attached here." (IER-508.) Quarles & Brady withdrew from
the case shortly thereafter, and ACS hired BurnsBarton to represent it as well.
(3-AccurateER-481–83.)

Swisher eventually obtained in discovery the June 11, 2015 Clawson

email to Zall containing the Phoenix and Northern Arizona Plans. It moved for sanctions against ACS and Clawson, arguing they had committed fraud on the court by filing the perjured affidavit. (2-SER-376–77.) Swisher also argued Defendants should be sanctioned for filing a modified affidavit with a substantive change via the notice of errata, without identifying that change to the court. (*Id.*) Swisher did not seek case-ending sanctions. (*Id.*)

## III. Swisher discovers the Southern Arizona Plan and files a second motion for sanctions.

During discovery, Swisher sought the Southern Arizona Plan referenced in the June 11, 2015 email, but Defendants did not produce it. In their **verified** response to Swisher's first motion for sanctions, Defendants stated: "Although Clawson's email to Zall stated that he would 'work on Southern Arizona tomorrow,' **Clawson never actually ended up formulating a plan for Southern Arizona**." (IER-489 (emphasis added).)

After learning Clawson had created the Phoenix and Northern Arizona Plans on his laptop computer, Swisher hired forensic computer expert Mark Cardwell to examine the laptop and a flash drive owned by Clawson. (1-SER-120.) As the parties negotiated the parameters of Cardwell's forensic inspection of the devices, BurnsBarton and ACS affirmatively tried to prevent discovery of the Southern Arizona Plan. Lancero stated:

> [W]e would like to limit the search to user-accessible files and deleted files. [Clawson] cannot reasonably access unallocated files, and data retrieved from unallocated space often cannot be associated with a specific date or time; i.e., the search would only reveal data that existed at any time in the past, according to Peak Forensics.

(IER-377.) Lancero confirmed through subsequent testimony that, in sending this email, she "did not want the plaintiffs or their expert to search unallocated space on . . . Clawson's computer." (IER-378.)

"Unallocated space" has a specific meaning here. Cardwell explained that even after a Microsoft Windows user moves a file to the recycle bin and then empties the bin, "all the files in the Bin still remain on the storage device in their original location, but are considered by Windows to be in 'unallocated space'." (IER-406.) They remain in "unallocated space" until they are overwritten by new files that are created and saved. (*Id.*) Thus, if a file is found in unallocated space, it was deleted. (IER-260.)

Cardwell found the Southern Arizona Plan in the unallocated space on Clawson's laptop—the very place where BurnsBarton tried to prevent Swisher from looking. (IER-409.) Because the file had been deleted, the "metadata" associated with the Plan had been lost, including the date created, date last modified, and date last accessed. (IER-405, 406.) Cardwell's analysis determined the "Southern Arizona Plan must have been deleted on or after August 13, 2015"— well after Swisher filed its lawsuit triggering Defendants' duties to preserve

evidence. (IER-410.)

Swisher filed a second motion for sanctions based on the spoliation of the Southern Arizona Plan, Defendants' false statement to the court that Clawson "never actually ended up formulating" it, and the issues addressed in its (then still pending) first motion for sanctions. (1-SER-90–91.) This time, Swisher requested the case-ending sanction of a default judgment. (*Id.*)

In response, Defendants and BurnsBarton incredibly moved to strike Cardwell's expert testimony as untimely. (3-AccurateER-424.) Then they attempted to explain away their false verified statement that the plan was never "formulated" as a "mistake" involving "poor word choice." Specifically, "Defendants' attorneys stated 'Clawson never actually ended up formulating a Southern Arizona plan' to signify that Clawson had never actually *finished* a Southern Arizona plan." (1-SER-76, 83 (emphasis added).) Defendants refused to admit the Southern Arizona plan had indeed been "formulat[ed]," despite the fact that it was "nearly identical to the Northern Arizona and Phoenix Plans." (IER-080.)

In reply, Swisher explained:

[I]f defense counsel was told by Defendants that the Accurate Southern Arizona Plan had been created but yet not "finished," their representation to the Court that the plan had never been "formulat[ed]" would render defense counsel an active participant in the fraud upon the Court.

> Defense counsel at all times owed a duty of candor to the Court. If defense counsel knew that the Accurate Southern Arizona Plan had been started, created, or existed at any time in any form, they were absolutely prohibited from representing to the Court that it had not been formulated. Conversely, if Defendants told their counsel that the Accurate Southern Arizona Plan had never been started, created, and/or never existed at any time in any form, Defendants cannot now claim that their false representation that it was never formulated is attributable to a mistake by their attorneys.

(IER-454.) Swisher "request[ed] that the Court schedule a hearing and question the responsible defense counsel regarding these matters." (IER-455–56.)

## IV. The district court holds an evidentiary hearing.

The court held a hearing on Swisher's second motion for sanctions on three nonconsecutive days: March 2, 15, and 22, 2018. (IER-600, 602, 603.) Swisher noticed Barton and Lancero as witnesses on its witness list, included an extensive list of topics upon which counsel intended to question them, and reiterated to Barton and Lancero on February 22 that it would seek their testimony. (1-SER-073, 046; IER-222, 039.) On day one, the court found "sufficient waiver" of the attorney-client privilege and allowed Swisher to call Lancero as a witness for "limited questioning."[4] (IER-340–41.)

Lancero testified that she had asked Clawson whether the Southern

---

[4] Neither Barton nor Lancero chose to retain their own counsel for any day of the hearing. When Lancero testified, Barton acted as Lancero's counsel, arguing against her testifying and objecting numerous times during her testimony. (IER-335–92.)

Arizona Plan existed in June 2016,[5] and "[h]is reply was that he put some words on a page but was heading to vacation and could not finish [it]." (IER-363.) In refusing to admit to wrongful conduct by Defendants or herself, Lancero "came up with an alternate version of events" (i.e. "that she believed the spoliated evidence to be just some 'words on a page'") which the district court later found to be "a contradiction to reality." (IER-040.) Specifically, Swisher's counsel asked:

> Q.　(BY MR. UPPAL) Ms. Lancero, now that you have the Accurate Southern Arizona Plan before you, are you contesting or arguing that it wasn't formulated? Doesn't it look formulated to you?
>
> A.　All I can say is that there's a list of customers on this one and two pages, and then the third page has some words as well.
>
> Q.　Is that a yes or no, Ms. Lancero? Does the Accurate Southern Arizona Plan that you have before you appear to be formulated to you?
>
> A.　It's hard to answer. I don't know what standard to use to say whether a specific plan created by someone is finished or not. It's my understanding that it wasn't finished, so you're using the term formulate, and –
>
> ***
>
> Q.　Did you, Ms. Lancero, make any kind of inquiry or effort to actually look at the Southern Arizona Plan before your firm on June 13, 2016, told the Court that it had never been formulated?
>
> A.　No.

---

[5] She equivocated about the date, but the district court found that this conversation occurred in June 2016. (IER-078.)

Q. But you knew it existed in some format, right?

A. No. It was extremely downplayed.

Q. That's fine. But even if it was downplayed, you knew it existed in some format; isn't that right?

A. To the extent that words on a page, sure.

Q. So that's a yes?

A. To the extent that words on a page can constitute existing, then yes.

\*\*\*

Q . . . But as you are here under oath on the stand, is it your position that in making the representation to the Court that the Southern Arizona Plan had never been formulated, even though you knew it existed, you complied with your duty of candor to the Court?

A. Yes.

(IER-361, 366, 375.) When Lancero's testimony concluded, the court continued the hearing. (IER-388.)

Swisher called Barton to testify on day two, two weeks later. After being physically presented with the multi-page Southern Arizona Plan, Barton still testified that it was not "formulat[ed]":

Q . . . Do you see where it says, "Although Clawson's e-mail to Zall stated that he would work on Southern Arizona tomorrow, Clawson never actually ended up formulating a plan for Southern Arizona"?

A.    I see that.

Q.    I read that correctly?

A.    You did.

Q.    That's a false statement, isn't it?

A.    It is not.

Q.    As you sit here today, you're still claiming that statement's not false?

A.    It was true when made.

Q.    Is it true today?

A.    One might argue about the linguistics, but, yes, it could be true today. Mr. Clawson still believes it's true today.

Q.    How about you?

A.    I do believe that there's a way it could be read as true.

(IER-223–24.) When asked whether the Phoenix and Northern Arizona Plans were "formulat[ed]," Barton admitted that they were. (IER-224–25.) He then claimed once again that the nearly identical Southern Arizona Plan "was never formulated." (IER-225.)

After Cardwell testified about his forensic investigation of Clawson's devices, Clawson took the stand. (IER-255.) He adopted the same incredible position as his lawyers and ACS regarding the Southern Arizona Plan:

Q . . . I'm not asking you about whether or not something was finished. I am asking you as you sit here on the stand today under oath under penalty of perjury right next to the Judge on the witness stand, is it your position that the Accurate Phoenix Arizona Plan was formulated, the Accurate Northern Arizona Plan was formulated, but the Accurate Southern

14

Arizona Plan was not formulated? It's a yes or no.

A.     I did not -- I would say no because I did not finish it and send it to Brad.

Q.     So I have that right. Two were formulated; one was not?

A.     Yes.

(IER-634.) Clawson also claimed he "didn't remember creating it" and then stated that he told Lancero that he had "gotten rid of it." (IER-663–64.)

On day three of the hearing a week later, Lancero (who did not attend day two due to illness), chose not to testify. (IER-212, 148.) Swisher's counsel and Barton presented oral argument on Swisher's second motion for sanctions. (IER-160.)

## V.     The district court imposes sanctions on Defendants and their attorneys.

The court ruled from the bench on day three of the hearing, then issued a written order with detailed factual findings. (IER-064, 197.) It found "Clawson created a false Affidavit containing multiple false statements, which he signed under penalty of perjury," and identified paragraphs 17 through 19 quoted above as containing the false statements. (IER-073–74.) The court identified the Action Plans and the June 11, 2015 email as evidence contradicting those statements. (IER-074.) And the false affidavit prejudiced Swisher because it "contributed to Plaintiffs' decision not to refile their preliminary injunction" application. (IER-

073)

The court found, "[b]ased on th[e] evidence and testimony," that Clawson "deliberately destroyed the Southern Arizona Plan and therefore engaged in spoliation of electronic discovery in violation of Rule 37," and did so "after Swisher filed [its] original state court Complaint, and after he was instructed by counsel to preserve all evidence, including electronic evidence." (IER-076–77 (footnote omitted).) Had Swisher not hired Cardwell, the court noted, the Plan "may never have been discovered"—and it went "to the heart of Plaintiffs' claims." (IER-077.) The court concluded that "Clawson knowingly and recklessly engaged in a violation of the discovery rules, which is relevant because it is a central component of Plaintiffs' complaint, when he engaged in the spoliation of critical evidence." (*Id.*)

As for BurnsBarton, the court expressed concern about the "manner in which the corrected affidavit was filed" and the content of the notice of errata, i.e., "what is not in the Notice." (*Id.*) It found the "Notice of Errata, which is generally used to correct small errors such as typo[s]," was filed here to "avoid[ ] alerting the Court that the original Affidavit was perjured or that it contained material misstatements of fact relevant to Plaintiffs' claims." (*Id.*)

The court found Lancero had "informed Clawson of his obligation to preserve evidence at the outset of the case" and "told him to image his computer,

but . . . never verified that he did so, nor did she ask him to produce his computer during the active discovery phase of this case"—and BurnsBarton never "followed up with Clawson on the preservation of discovery." (IER-078.) Based on her testimony regarding conversations with Clawson, the court found "Lancero was aware that Clawson started what is now known as the Southern Arizona Plan" and "apparently did not then inform Mr. Barton that their client told her that he had started [it]." (*Id.*)

The court stated that BurnsBarton's attempt to keep Swisher from examining the unallocated space on Clawson's laptop—"the exact space in which the deleted documents in question were ultimately found"—was "extremely suspect." (IER-078–79.) It also highlighted BurnsBarton's attempt to strike portions of Cardwell's testimony as untimely, when the reason for the delay was that the Southern Arizona Plan "had been deleted by Clawson, taking substantial time and effort on behalf of Mr. Cardwell to recover [it]." (IER-at 080.)

Regarding Defendants' statement that the Southern Arizona Plan was never "formulat[ed]," the court found "Lancero engaged in unprofessional and unhelpful word play in this hearing, by using language such as 'formulated' versus 'finished' and 'words on a page.'" (IER-084.) Barton "advanced the same wordsmithing by continuing to use the phrase 'words on a page,' by continuing to argue that the plan was never 'formulated' or finished, and by stating that

differing minds could 'argue about the linguistics.'" (IER-085 (citations omitted).) The court found "this testimony irresponsible, and indicative of a lack of appreciation for the seriousness of the proceedings." (*Id.*)

Ultimately, the court observed, "[n]either counsel [Lancero nor Barton] has ever conceded that the Southern Arizona Plan, and the lists of information in it, was or is discoverable. That is simply unacceptable." (*Id.*) There was "no contrition or acknowledgment by Lancero or Barton that matters could have been more appropriately handled." (*Id.*) Instead, Barton criticized the court "proceedings on this matter as a 'side show' that had become an attack on his law firm." (*Id.* (citation omitted).) The court concluded:

> [T]here is clear and convincing evidence that Defendant Clawson engaged in the spoliation of evidence, that he attempted to cover up that spoliation, and thus that he has engaged in a fraud on the Court. He also did so when he signed the first perjured Affidavit that was then filed with the Court. The Court finds that the briefing submitted and the testimony at the hearings are clear and convincing evidence that Ms. Lancero and Mr. Barton facilitated and continued to cover up Clawson's fraud and their own irresponsible conduct."

(IER-085–86.)

Before issuing sanctions, the court analyzed this case using the relevant factors to determine whether case-ending sanctions are warranted. (IER-087–92); *see Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). "Sadly, the Court [found] that this case is one of the exceptional cases

that warrants such a drastic sanction." (IER-092.) It granted Swisher's motion, ordered the entry of default against ACS and the Clawsons, struck their answers, and ordered Barton and Lancero to self-report to the Arizona State Bar and provide a transcript of their testimony. (IER-093.)

ACS moved to set aside the default, "argu[ing], for the first time, that its former business executive and its former attorneys were responsible for the spoliation of evidence and the willful deception of the Court, and that Zall had no knowledge of the misconduct." (IER-050.) The court rejected this argument and denied the motion, highlighting that ACS, not Zall, was a party here. (*Id.*) It noted "a corporation acts through its officers, agents or employees and is liable for the actions of such persons acting within the scope of their agency" and found "ACS acted through its business development executive, Clawson," when he created the Action Plans, deleted the Southern Arizona Plan, and attempted to cover it up. (IER-051, 053–54.) The court also found Zall had direct knowledge of Clawson's solicitation efforts, use of Swisher's confidential information, and false statements. (IER-053.)

The court highlighted the Supreme Court's holding that "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633 (1962); (IER-056). It found "ACS chose

to continue to have BurnsBarton represent it throughout these proceedings, even after the allegations of spoliation, false affidavits, and misconduct by Clawson came to light," and "the misdeeds of ACS's attorneys were done for the benefit of ACS and to the detriment of Plaintiffs." (IER-057.) The court therefore found it proper to consider BurnsBarton's misconduct in sanctioning ACS. (*Id.*)

## VI.    The district court awards fees and damages.

 Swisher moved for monetary sanctions against Defendants and their now former counsel, as Barton and Lancero had withdrawn from the case. (*See id.*; 1-SER-062–72.) (The court allowed them to intervene to contest Swisher's motion. (1-SER-061; IER-043.)) At first, the court awarded Swisher all its requested attorney's fees and costs, totaling $527,087.46, jointly and severally against Defendants and BurnsBarton. (IER-063.) It then reconsidered that award *sua sponte* in light of *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017). (IER-036.) The court found $153,800 in attorneys' fees "would not have been incurred but-for Clawson's and Defendants' conduct" and awarded that amount to Swisher, jointly and severally against Defendants and BurnsBarton. (IER-038.)

Then, after reviewing the pervasive, egregious misconduct committed by Defendants and their counsel, it determined that this was an "exceptional case" under *Goodyear*, justifying an "additional compensatory award" of attorney's fees. (IER-041.) It awarded another $153,800, jointly and severally against

BurnsBarton after specifically finding BurnsBarton "attempt[ed] to defile the very temple of justice." (IER-041 (quotation marks omitted).)

Swisher also moved for compensatory and punitive damages, while Defendants sought a ruling on the enforceability of the covenants in Clawson's Employment Agreement. (*See* IER-024–25.) On the latter, the court found the employee non-solicitation provision invalid under North Carolina law (which controlled that Agreement) but upheld the confidentiality provision. (IER-030-31.)

The court then held a hearing on damages, requiring Swisher to prove its damages (though the default established the other elements of its claims). Swisher sought compensatory damages for profits lost from customers who switched their business from Swisher to ACS as a result of Clawson's and ACS's conduct. Blake Thompson (former Senior Vice President for Supply Chain at Swisher) testified for Swisher. Zall and Ken Kidder ("the purchasing representative of one of the customers that plaintiff claimed moved its business due to use of or improper use of confidential information") testified for Defendants. (2-AccurateER-176–77.)

The court found Swisher proved twenty-six "customers left Swisher for ACS as a direct result of Clawson's solicitations and breach of the duties he owed to Swisher" and calculated lost profits from them but held Swisher had not met its burden regarding other customers it identified. (IER-018.) The court

awarded Swisher "compensatory damages in the form of lost profits, jointly and severally against all Defendants, in the amount of $384,234.39." (IER-022.)

The court found punitive damages were warranted as well. It reviewed its "numerous findings related to the egregious conduct of Defendants" that justified punitive damages, "[s]eparate and apart from the litigation misconduct that occurred in this case." (IER-020.) The court then found Defendants' "concerted effort to wrongfully withhold evidence, misrepresent the fact that discoverable evidence existed, and mislead Plaintiffs and the Court," along with their "pattern of deceptive and abusive discovery practices that attempted hide the truth from Plaintiffs and the Court," further supported punitive damages. (IER-020.) The court awarded "punitive damages, jointly and severally against all Defendants, in the amount of $768,468.78." (IER-022.)

ACS moved for reconsideration and a new trial under Rule 59(e). The court denied the motion. (IER-010.) ACS appealed and BurnsBarton joined the appeal as intervenors.

## Summary of the Argument

The district court correctly held ACS responsible for the misconduct of its attorneys and its executive Clawson. The court properly found that "the actions of ACS executive Clawson, and the misdeeds of ACS's attorneys, were done for the benefit of ACS and to the detriment of Plaintiffs." (IER-057). ACS continued

to employ Clawson for years, even after multiple accusations and findings concerning his fraudulent misconduct, perjury, and spoliation. It also chose to have his counsel represent it in a joint defense, and continued this representation despite "the allegations of spoliation, false affidavits, and misconduct." (*Id.*) ACS never distanced itself from Clawson's or its own lawyers' conduct until after the court imposed sanctions. The evidence shows Clawson and BurnsBarton acted to further ACS's interests in all their wrongdoing. Moreover, ACS, through its owner, Zall, had direct knowledge that Clawson had lied in his affidavits when ACS chose to file them.

The district court acted within its discretion when it sanctioned BurnsBarton. First, they received due process. Swisher's witness list, reply brief, and email to Barton and Lancero put them on notice that Swisher would seek their testimony about their possible misconduct at the sanctions hearing. The court afforded them enough time to prepare and defend themselves by spacing the three days of the hearing over several weeks and letting them present evidence and arguments about their actions. Second, the court did not clearly err in its fact-finding. It chose to credit Lancero's damaging in-court testimony over Barton's subsequent, self-serving testimony and permissibly chose between competing views of the evidence. Other evidence of BurnsBarton misleading the court bolsters those conclusions.

The district court did not abuse its discretion by awarding attorney's fees. Its first award against Defendants and BurnsBarton stemmed from Swisher's counsel's specific work responding to and addressing their misconduct. ACS and its counsel's concerted misconduct justifies joint and several liability. *Goodyear* explicitly authorizes the second fee award (against just BurnsBarton). The court made clear the additional award was "compensatory" and the egregious, pervasive nature of the misconduct made this an "exceptional case," justifying a fee award stemming from an entire phase of the litigation.

The district court acted within its considerable discretion in awarding and calculating compensatory damages. Liability, including causation, was properly pleaded in Swisher's complaint and thus established by the default judgment. The court awarded damages only for twenty-six lost customers about which Swisher presented ample evidence at the hearing. It properly rejected as irrelevant ACS's evidence on causation and was entitled to limit the amount of time the parties could present testimony.

The district court did not abuse its discretion in awarding punitive damages. The well-developed record contains overwhelming support for its conclusion that Defendants acted with an "evil mind" by engaging in a coordinated corporate raiding scheme to steal Swisher's customers and employees by misusing its confidential information—and then covering up their actions by lying to

the court and destroying evidence. Caselaw has upheld larger awards based on less serious conduct.

<h2 style="text-align:center">Argument</h2>

Swisher addresses ACS's and BurnsBarton's arguments below as they relate to the district court's several relevant orders in this case, starting with the first in time.

## I.   The Default Judgment Against ACS

### A.   Standard of review

Sanctions imposed under Rule 37 or a court's inherent power are reviewed for abuse of discretion. *Hilao v. Estate of Marcos*, 103 F.3d 762, 764 (9th Cir. 1996); *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). Questions of law are reviewed de novo. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109 (9th Cir. 2005).

### B.   Legal standards

Federal courts possess "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link*, 370 U.S. at 630–631. That authority includes "the ability

to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Courts may use this power to enter a default judgment "when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). Additionally, "a district court is within its discretion in entering default judgment against a party who . . . interferes with the production of evidence." *Nostalgia Network, Inc. v. Rayle*, 56 F. App'x 344 (9th Cir. 2003).

Federal Rule of Civil Procedure 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court . . . only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may . . . dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).[6]

### C. The district court correctly held ACS responsible for the misconduct of its attorneys and its Senior Business Development Executive, Clawson.

ACS argues the district court abused its discretion by sanctioning ACS "based solely on conduct by Clawson and BurnsBarton." (Appellant's Br. at 23.)

---

[6] Rule 37(e) applies here even though the Southern Arizona Plan was eventually recovered because when Clawson deleted it, the metadata for the document was permanently lost. (*See* IER-406.)

The court rejected this argument in detail when ACS raised it in its motion to set aside the default. (IER-043–63.)

The court noted that this was the "first time" ACS attempted to put any distance between itself and Clawson or BurnsBarton. (IER-048.) For the vast majority of the litigation below, Clawson and ACS defended this case in lockstep. They jointly filed the same briefs, made the same arguments, and chose to be represented by the same counsel. ACS chose to speak through Clawson and "chose to continue to have BurnsBarton represent it throughout these proceedings, even after the allegations of spoliation, false affidavits, and misconduct by Clawson came to light." (1-AccurateER-037.)

The district court chose to entertain ACS's arguments, made only after it issued the default sanction, but this Court should refuse to do so and treat them as forfeited. *See Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 628 n.5 (9th Cir. 1996) (enforcing forfeiture where party "failed to argue the vicarious liability claim in its opening brief"); *see also Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 445 (6th Cir. 2021). At the very least, ACS's tardy attempt to disclaim responsibility for the actions of its own attorneys and executive should reframe the inquiry as follows: the district court did not abuse its discretion when it determined that this argument did not constitute "good cause" to set aside the default under Rule 55(c). *See FTC v. Cottelli*, 854 F. App'x 837, 839 (9th Cir. 2021).

### I. ACS had direct knowledge of Clawson's misconduct and lied to the district court.

Zall was the "100% owner" of ACS at all relevant times. (2-AccurateER-172.) "The knowledge of a . . . sole shareholder or controlling person of a corporation is imputable to that corporation." *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (citation omitted). So ACS is directly responsible for everything Zall knew, when he knew it. The district court's determinations as to Zall's knowledge are factual findings insulated by clear-error review. And, especially given the facts of this case, the court was entitled to reject ACS's self-serving affidavits (filed after the default sanction) attempting to explain away many instances of misconduct. (*See* 2-AccurateER-285.)

First, "Zall was aware of Clawson's actions" related to the Action Plans' creation. (IER-053.) ACS hired Clawson "to develop business for ACS." (*Id.*) "Zall asked Clawson to 'formulate' and prepare a plan to develop ACS's business, which Clawson did, using [Swisher's] confidential proprietary information." (*Id.*) Clawson "identified over 100 Swisher customers that ACS should 'go after'" in the Phoenix and Northern Arizona Plans and then "gave this information to Zall" via email. (*Id.*)

Second, Zall "was aware of Clawson's solicitation of Swisher customers." (*Id.*) "Clawson testified at his deposition that he mistakenly solicited a Swisher

customer while making 'cold calls,'" but discovery "revealed that Clawson had developed a custom 15-page PowerPoint presentation for this customer, therefore indicating that Clawson's actions with that customer were intentional." (*Id.*) "Zall was present at Clawson's deposition when these false statements were made, therefore, he was aware of Clawson's solicitation of Swisher customers." (*Id.*)

This means ACS knew paragraphs 17 through 19 of the original Clawson affidavit were false when it filed them. It knew Clawson had in fact "solicited Swisher customers," identified "Swisher customers that ACS should go after," and provided "Swisher confidential information or property to" ACS. (*See* IER-541.) Submitting this knowingly false testimony "constitute[d] a fraud on the court." *United States v. Stonehill*, 660 F.3d 415, 445 (9th Cir. 2011). ACS committed another fraud on the court later when it filed the modified Clawson affidavit with two of the three false statements remaining therein.

### 2. ACS is responsible for Clawson's misconduct.

But ACS's liability extends beyond Zall's personal knowledge. As the district court emphasized, Zall was never a party to this case. (IER-050.) ACS was. ACS is a corporation, which "can act only through its agents." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1068 (9th Cir. 2014) (citation omitted). "[A]n employer is vicariously liable for [its agent's, including its employee's] acts only if

the employee is acting within the scope of employment." *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601 (Ariz. 2012). Relevant factors to consider here "include the previous relations between the employer and the employee and whether the act (a) was the kind the employee was hired to perform, (b) was commonly done by the employee, (c) occurred within the employee's working hours, and (d) furthered the employer's purposes or fell outside the employer's enterprise." *Id.* (cleaned up).

Clawson worked for ACS as a Senior Business Development Executive. The district court properly found that he was acting within the scope of his employment with ACS when he solicited Swisher's employees and customers, and when he used Swisher's confidential information to identify potential customers, on behalf of ACS. (IER-057–58.) ACS cannot seriously argue otherwise.

Instead, ACS argues Clawson acted outside the scope of his employment when he spoliated the Southern Arizona Plan, and ACS attempts to distance that action as much as possible from its creation. (Appellant's Br. at 25–34.) The district court rejected this argument and found that "Clawson's actions in not only creating the plan, *but also in deleting the plan and attempting to cover it up*, furthered ACS's purposes and was for the benefit of ACS." (IER-054 (emphasis added).) ACS now argues, after being caught, that the deletion was not to its own benefit, just Clawson's. But ACS's and Clawson's interests were perfectly

aligned here. There is no evidence Clawson's spoliation of the Southern Arizona Plan would do anything but benefit both himself and ACS in the exact same way in Swisher's lawsuit against them. Their joint representation by the same attorneys for most of this case show how closely they chose to align themselves.

The district court also recognized that ACS had some level of knowledge about the Southern Arizona Plan's existence. After all, "Clawson told Zall that he would start working on a plan for Southern Arizona tomorrow" in the June 11, 2015 email. (*Id.*) Sending Clawson a litigation hold at the beginning of Swisher's lawsuit did not absolve ACS of all responsibility for Clawson's spoliation of the Southern Arizona Plan.

ACS is responsible for Clawson's other misconduct as well, like his evasive testimony at the sanctions hearing. He was the only ACS (non-attorney) representative present during any day of the hearing. ACS made a "strategic litigation decision" to not have Zall appear or testify at the hearing and instead speak solely through Clawson. (IER-050.) ACS must now live with that decision. There is no daylight between ACS and Clawson in this case. That is due to ACS's conscious, strategic decision-making.

### 3. ACS is responsible for BurnsBarton's conduct.

In "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent." *Link*, 370 U.S. at 634. This Court has upheld

the dismissal of a case based *solely* on the conduct of a party's attorney. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 134 (9th Cir. 1987). And the Supreme Court has held "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Link*, 370 U.S. at 633.

The district court found the "misdeeds of ACS's attorneys were done for the benefit of ACS and to the detriment of [Swisher]." (IER-057.) In other words, BurnsBarton did not go rogue. They engaged in a concerted, sophisticated effort to mislead the court and Swisher to the benefit of their clients, including ACS. And "ACS chose to continue to have BurnsBarton represent it throughout these proceedings"—literally for years—"even after the allegations of spoliation, false affidavits, and misconduct by Clawson came to light." (*Id.*)

Given the egregious misconduct of BurnsBarton in this case, the district court could have issued case-ending sanctions solely on that basis. But it did not. It clarified: "Although not the sole reason for denying the motion to set aside the default, ACS's argument that its attorneys' conduct cannot be considered fails." (*Id.*) This further shows the court did not abuse its discretion by entering a default judgment against ACS.

## II.  The Sanctions Against BurnsBarton

### A.  Standard of review

District courts "have inherent authority to discipline lawyers." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir. 1995). Sanctions on attorneys under this inherent power are reviewed for abuse of discretion. *Hale v. U.S. Tr.*, 509 F.3d 1139, 1146 (9th Cir. 2007).

### B.  The district court's findings of fact are not clearly erroneous.

BurnsBarton argue the district court's factual findings of their bad-faith actions are clearly erroneous. But a trial court's findings of fact are thickly insulated from appellate review. This Court "will affirm a district court's factual finding unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) (footnote omitted). BurnsBarton cannot meet their high burden, as the court engaged in detailed factfinding related to Burns-Barton's misconduct after holding an extensive hearing over three nonconsecutive days with hours of witness testimony. (IER-072–086.)

BurnsBarton argue they did not know Clawson's original affidavit contained false statements when it was filed. (Intervenors' Br. at 57–58.) But that is beside the point. BurnsBarton's subsequent conduct covering up that and other misconduct by Defendants led to the sanctions against them. In the notice of

errata, they refused to tell the district court what the material change was between the original and new affidavits. The court was entitled to choose between two views of this conduct:

> The Court finds this, at best, to be a misuse of a Notice of Errata, which is generally used to correct small errors such as typographical errors or perhaps a misstatement of a date. At worst, this Notice of Errata was an attempt to replace a perjured sworn Affidavit. Filing it in this way avoided alerting the Court that the original Affidavit was perjured or that it contained material misstatements of fact relevant to Plaintiffs' claims. Based on the record and considering counsel's testimony, the Court finds the latter to be true.

(IER-077.) "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

BurnsBarton attempt to minimize this issue, claiming the original affidavit "was no longer of importance to the litigation because the motion it accompanied had been withdrawn." (Intervenors' Br. at 60.) But the district court found that Swisher withdrew its preliminary injunction application due to Defendants' "patently false" albeit sworn affidavit; it therefore prejudiced Swisher. (IER-069, 073.) Moreover, perjury is more fundamental and important than one case's merits. Filing a false statement with a court is never acceptable, and BurnsBarton had the duty to correct the "patently false" sworn statement once they discovered it. The manner in which they did so purposely hid the ball from the court.

Next, BurnsBarton argue that Lancero did not know about the existence

and subsequent deletion of the Southern Arizona Plan before Cardwell discovered it on Clawson's laptop. (Intervenors' Br. at 61.) This argument directly contradicts Lancero's and Clawson's testimony. In fact, BurnsBarton admit "the evidence before the District Court on the question of when counsel learned of the Southern Arizona Plan was contradictory." (Intervenors' Br. at 64.) Undeterred, they assert Lancero's damaging testimony at the hearing was inaccurate because Lancero failed to prepare. (*Id.* at 31.) That is absurd. First, as discussed below, Lancero knew of Swisher's intent to call her as a witness at the hearing. Second, Swisher requested that she testify before Clawson to prevent BurnsBarton from tailoring their testimony to his after the fact. (IER-343.) That is exactly what happened later, with Barton attempting to downplay Lancero's knowledge on day two of the hearing and then submitting a self-serving declaration after the court sanctioned them. (*See* IER-238, 2-AccurateER-258.)

As for contemporaneous evidence, BurnsBarton cannot explain away Lancero's objection to Swisher searching the unallocated space on Clawson's laptop, the very place where Cardwell found the deleted Southern Arizona Plan. As Lancero conceded, had Swisher agreed to not look there, "the Southern Arizona Plan would have never been uncovered." (IER-079.) The district court was entitled to draw the reasonable inference from this that BurnsBarton knew the Southern Arizona Plan existed and had been deleted, and then tried to

prevent Swisher from finding it.

But beyond that, Lancero specifically testified that she knew the Southern Arizona Plan existed and Clawson testified that he told her he had "gotten rid of it." (IER-363, 664.) The district court was well within its discretion to credit that testimony and discredit Lancero's and Barton's inconsistent, self-serving subsequent testimony—choosing between two permissible views of the evidence. It also properly rejected Barton's attempts to minimize and downplay Lancero's knowledge of the existence of the Southern Arizona Plan because Barton's efforts contradicted Lancero's in-court testimony on this subject. (*See* Intervenors' Br. at 63–64.) Additionally, the court noted that Barton wrote a letter stating Clawson "deleted the Accurate Phoenix Plan and Accurate Northern Arizona Plan . . . on June 11, 2015, well before Swisher filed the complaint on June 24, 2015." (IER-076.) But this "statement is in complete contradiction of Mr. Cardwell's findings." (*Id.*) Based on Cardwell's expert testimony, the court found these Plans were actually deleted on or after "October 20, 2015" and "December 16, 2015," respectively. (*Id.*) BurnsBarton now accuses the district court of "ignoring" its late-submitted evidence, but rejecting unpersuasive evidence does not mean it was ignored. (*See* Intervenors' Br. at 56.)

As to the imaging of Clawson's laptop, the district court found Lancero told Clawson to do so, but "never verified that he did so." (IER-078.)

BurnsBarton argues that Clawson's vague statement that "I think I have it figured out" somehow satisfied their duty to preserve evidence and they "had no reason to believe Clawson would not preserve documents or information pertaining to the case pursuant to their instructions." (Intervenors' Br. at 65.) But Clawson's other misconduct provided an excellent reason to be suspicious. And none of this contradicts the district court's observation that they still did not ensure Clawson imaged his laptop.

Other evidence of BurnsBarton's bad-faith conduct further strengthens the district court's reasoned selections between different views of the evidence. In Defendants' motion for summary judgment, BurnsBarton argued Clawson's Employee Agreement with Swisher was unenforceable under Arizona law "without acknowledging that the Agreement itself expressly states it is governed by North Carolina law." (IER-092 (citation omitted).) The district court found this misleading at the time, and in the sanctions order, cited it as additional evidence of BurnsBarton's pattern of "willful deception." (*Id.*)

Finally, none of BurnsBarton's challenges to the district court's factfinding excuses their astonishing lack of candor during the sanctions hearing. Their engagement in cynical wordplay and repeated refusal to admit the Southern Arizona Plan "was formulated" even when it was physically placed before them, constitutes overwhelming evidence of bad faith. The court also found that

Lancero's refusal to admit her conduct was wrong was exacerbated by the fact that "she came up with an alternate version of events to explain her conduct. This story, that she believed the spoliated evidence to be just some 'words on a page,' [was] a contradiction to reality." (IER-040.) The court found Barton's testimony to be "equally troubling" in that he "advanced the same wordsmithing by continuing to use 'words on a page,' by continuing to argue the plan was never 'formulated' or finished, and by stating differing minds could 'argue about the linguistics.'" (IER-085.) This conduct would be egregious for an ordinary witness testifying under oath. Attorneys are held to higher standards, and Burns-Barton fell far short. The district court correctly sanctioned them for their misconduct.

## C. BurnsBarton received due process.

BurnsBarton argue they did not receive due process before the district court sanctioned them. (Intervenors' Br. at 40.) "[A]n attorney subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard." *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) (citation omitted). "[W]hether the district court provided adequate process before imposing sanctions" is a question of law reviewed de novo. *Lasar*, 399 F.3d at 1109.

## I.    BurnsBarton had prior notice that Swisher sought Barton's and Lancero's testimony at the hearing and that their actions and misconduct were at issue.

BurnsBarton claim they had "no notice that the initial [March 2, 2018] hearing would address their conduct as counsel." (Intervenors' Br. at 42.) This is incorrect. Swisher's multiple court filings put them on notice that it would seek their testimony. On February 7, the district court granted oral argument for Swisher's second motion for sanctions, set a hearing on March 2 and the final pretrial conference, and stated: "the parties shall be prepared to discuss the discovery issues raised in [Swisher's] Motion for Default Judgment and Second Motion for Sanctions." (1-SER-74.) And "[t]he parties shall have any necessary witnesses available and present at the hearing to testify and be ready to offer any necessary exhibits." (*Id.*) Swisher noticed Barton and Lancero on its witness list. (1-SER-73.) Barton admitted Swisher's counsel told "[him] and Ms. Lancero in writing on February 22, point blank, that [Swisher] would be calling [him] and her as witnesses at the [March 2] evidentiary hearing." (IER-222.) As the district court noted: "Plaintiffs' Counsel informed Mr. Barton and Ms. Lancero over a week prior to the hearing that 'we intend to call you both to testify'"—"Ms. Lancero responded to that email by stating that 'David [Barton] and myself will

be present at the hearing on Friday.'" (IER-061 (bracketed text in original) (quoting 1-SER-46).)

Long before that, in the reply in support of its second motion for sanctions, Swisher discussed at length Defendants' arguments regarding the attorney-client privilege and the Clawson affidavit, and stated: "if the Court has any inclination to indulge the Defendants' preposterous argument that the word 'finishing' can somehow be substituted for 'formulated,' **Plaintiffs respectfully request that they be permitted to depose the unidentified defense counsel who allegedly chose the words at issue by mistake**." (IER-455 (emphases in original).) Swisher then alternatively requested "that the Court schedule a hearing and question the responsible defense counsel regarding these matters," listing five subjects to be addressed therein, including "why defense counsel represented and continued to represent to the Court that the Accurate Southern Arizona Plan had never been formulated if defense counsel knew at any time of its existence in any form." (IER-455–56 (citation omitted).) Swisher further stated: "If Defendants want to maintain th[eir] preposterous argument, *defense counsel must submit to questioning under oath*." (IER-456 (emphasis added).) Thus, BurnsBarton was on notice as of April 6, 2017—nearly a full year before the first sanctions hearing—that Swisher would seek their testimony on these issues.

Nevertheless, BurnsBarton argue they lacked notice that they could be

sanctioned, even during the third hearing. (Intervenors' Br. at 43.) But Swisher's reply brief told them exactly what Swisher wanted to question them about. And Barton's and Lancero's knowledge of their own misconduct further contributes to their prior notice that sanctions may be issued against them. *See Link*, 370 U.S. at 632 ("The adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct.").

Barton's statements throughout the hearing also show knowledge that BurnsBarton's actions were at issue:

- "I would ask the Court to consider whether this side show has, quite frankly, become an attack upon my firm." (IER 217–18.)

- "I can affirm to the Court that we have done nothing wrong. We have not engaged in any fraud on the Court." (IER-218.)

- "I'm being accused of misconduct and attempt to cover-up." (IER-164.)

- "[Plaintiffs are] saying we had perjured ourselves and that somehow this law firm, my law firm, was engaged in that fraud. They've now attacked me and my firm." (IER-169.)

- "Plaintiff is now accusing me of fraud on the Court . . . ." (IER-171.)

Barton's closing argument at the third hearing is particularly illuminating. He characterized the hearing as "a travesty of justice," described Swisher's arguments as "ad hominem attacks," and accused *Swisher* of lying and engaging in a "cover up." (IER-160–72.)

Swisher also made clear BurnsBarton's misconduct was at issue. At the second hearing, its counsel noted Defendants' response brief "put the misconduct of defense counsel at issue," stated defense counsel had "engaged in gross misconduct," and argued "[i]t's not any stretch to now have Mr. Barton answer about his firm's role in what is clearly misconduct and part and parcel of fraud upon the Court." (IER-219.) BurnsBarton had prior notice every step of the way that they could be sanctioned.

### 2. The district court gave BurnsBarton the opportunity to be heard.

BurnsBarton also claim the district court did not "allow them to offer any evidence to defend their conduct." (Intervenors' Br. at 43.) Not so. The court gave BurnsBarton the opportunity to call witnesses, object to Swisher's evidence, and make a summation. Lancero and Barton both testified at the hearing, and Lancero had the opportunity to retake the stand on the third day but chose not to. (IER-148.) The content of BurnsBarton's evidence and arguments shows they were defending themselves as much as their clients throughout. Moreover, the court took care to "continue this matter"—twice—"so that both sides can have an opportunity to make a full record here." (IER-385.) This gave Burns-Barton plenty of time to prepare and present additional evidence to defend themselves on days two and three.

It's true that Barton requested a separate hearing to address attorney

misconduct. (Intervenors' Br. at 43.) But due process does not require a hearing *at all*, much less a separate hearing. *Pac. Harbor*, 210 F.3d at 1118. The district court held three days of hearings, each spaced out by at least a week. BurnsBarton's misconduct was discussed at length each day, and both Lancero and Barton testified as witnesses. That is sufficient process.

BurnsBarton also claim the district court somehow prevented them from obtaining separate counsel at the hearing. It didn't. BurnsBarton knew Swisher would seek Barton's and Lancero's testimony on day one. An attorney who "[a]nticipat[es] that he might testify . . . at [an] evidentiary hearing" may wish to "obtain[ ] separate counsel" for himself and his client. *Awon v. United States*, 308 F.3d 133, 138 n.2 (1st Cir. 2002). BurnsBarton chose not to do so. Then, for the second and third days, BurnsBarton *still* did not obtain their own counsel. Their lack of counsel was a strategic decision of their own making.

## III. The Fee Award

### A. Standard of review

A court may, under its inherent power, "instruct[ ] a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear*, 137 S. Ct. at 1186 (cleaned up). "[T]he court can shift only those attorney's fees incurred because of the misconduct at issue." *Id.* That is, "[t]he complaining party . . . may recover only the portion of his fees that he would not have paid

43

but for the misconduct." *Id.* at 1187 (cleaned up). "A district court's decision to award attorney's fees is reviewed for abuse of discretion." *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1059 (9th Cir. 2006). "Elements of legal analysis and statutory interpretation that figure into the district court's attorney's fees decision are reviewed de novo." *Id.* at 1059–60 (citation omitted).

## B.    The fee award as to ACS

ACS challenges the fee award on the same grounds as the default judgment, i.e., it does not advance any argument particular to the fee award. Accordingly, Swisher incorporates its arguments in Section I, *supra*, explaining why ACS's arguments challenging the default judgment fail.

## C.    The fee award as to BurnsBarton

### 1.    The district court did not abuse its discretion by imposing joint and several liability on the fee award.

BurnsBarton argue that, in awarding fees, "the district court failed to distinguish between the harm, if any, caused by Barton and Lancero and the harm caused by their clients," and "also failed to determine the amount of fees incurred specifically from Barton and Lancero's conduct." (Intervenors' Br. at 47.) But it did neither. That the court applied joint and several liability does not mean it failed to consider who caused what harm under *Goodyear*, and it was not required to specifically apportion the award unless it found that course of action

was appropriate. Indeed, the court's orders discussed at length the coordinated actions of Defendants and BurnsBarton and how they acted in concert at several critical junctures. (*See* IER-089 ("Defendants and their counsel did not preserve relevant discoverable evidence, rather, they knew of it and withheld it.").) This is the exact situation where joint and several liability should apply. *See In re IVDS Interactive Acquisition Partners*, 302 F. App'x 574, 576 (9th Cir. 2008).[7]

Moreover, the district court *did* apportion the fee award. It found Burns-Barton liable for the entire award, while extending only half the liability to Defendants as well. BurnsBarton may disagree with that decision, but that does not make it any less reasoned.

BurnsBarton also fault the district court for relying on "a Rule 37 sanctions case . . . *Hyde & Drath v. Baker*, 24 F.3d 1162, 1172 (9th Cir. 1994), to impose sanctions jointly and severally against Defendants and their counsel." (Intervenors' Br. at 54.) But this Court looks to Rule 37 cases in the inherent-power context and vice versa: "[We] use cases involving dismissal under Rule 37 and inherent powers interchangeably. Further, cases involving a dismissal of

---

[7] To the extent BurnsBarton challenge the lack of apportionment of the fee award between and among themselves, the district court found that Barton and Lancero acted in concert or Lancero acted while Barton was "responsible for managing and supervising" her. (IER-222, 085–86.) BurnsBarton PLC is on the hook for the misconduct of its principal, Barton, and its agent, Lancero, who acted within the scope of her employment at all relevant times.

plaintiff's complaint as a sanction are comparable to those involving dismissal of a defendant's answer." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 n.4 (9th Cir. 1990) (citation omitted).

BurnsBarton stress that fee awards under Rule 37 do not necessarily require finding bad faith, which is required for fee awards under the inherent power. But here, the district court *did* find BurnsBarton engaged in bad-faith conduct:

- "[T]he evidence and testimony overwhelmingly demonstrate that Defendants' and counsels' misconduct was willful and done in bad faith." (IER-092.)
- "[D]efendants['] and counsel's conduct was willful, and it was done in bad faith." (IER-199.)

Also, the court cited *Hyde* for the proposition that "courts may impose sanctions jointly and severally against multiple parties for their conduct." (IER-060.) BurnsBarton do not deny this is also true for sanctions under a court's inherent power, in appropriate cases. *See, e.g.*, *In re George*, 322 F.3d 586, 588 (9th Cir. 2002). BurnsBarton identify no legal error in the mere citation to *Hyde* for an uncontroversial statement of law.

## 2. The district court made clear that the second fee award was an additional compensatory award.

BurnsBarton argue the second fee award constitutes "arbitrary and punitive sanctions" in violation of *Goodyear*. (Intervenors' Br. at 47.) But the district

court went no further than compensating Swisher for some of the fees it incurred. Not a cent of the award relates to "punishment." For one thing, the court explicitly described the second award "as an additional *compensatory* award to Plaintiffs." (IER-041 (emphasis added).)

For another, the entire award is significantly less than the fees Swisher incurred in this case. Recall that the district court originally awarded $527,087.46 in attorney's fees and costs before reducing it. (IER-063.) That number was based entirely on fees actually incurred and was limited further in multiple ways. First, Swisher "voluntarily reduced [this] attorneys' fees request by more than 20%, 'omitting unnecessary, duplicative, or excessive time, and deleting time related to tasks that would have been performed even in the absence of misconduct by Defendants and their former counsel.'" (IER-061 (quoting 1-SER-67).) Second, Swisher "d[id] not seek to be awarded fees for the initial investigation of the case or the preparation and filing of the Complaint, because the spoliation of evidence had not yet occurred." (*Id.*) Thus, "[t]his amount reflected fees accumulated by Plaintiffs since the spoliation of evidence on August 13, 2015." (IER-035.)

Even if the district court had stuck with this original amount, it would not constitute a "punitive" award of attorney's fees. In *Goodyear*, the Supreme Court specified there are situations in which a "full" fee award like this would be an

appropriate compensatory award:

> In exceptional cases, the but-for standard even permits a trial court to shift all of a party's fees, from either the start or some midpoint of a suit, in one fell swoop. *Chambers v. NASCO* offers one illustration. There, we approved such an award because literally everything the defendant did—"his entire course of conduct" throughout, and indeed preceding, the litigation—was "part of a sordid scheme" to defeat a valid claim. Thus, the district court could reasonably conclude that all legal expenses in the suit "were caused solely by his fraudulent and brazenly unethical efforts."

137 S. Ct. at 1187–88 (cleaned up). The district court noted that "[t]his 'exceptional case' rule will be upheld so long as all fees are 'in some way traceable to' bad faith activity." (IER-036 (citation omitted).) It also stated that, "in cases of extreme egregious conduct, it '[i]s within the court's discretion to vindicate itself and compensate' the plaintiff for all of its fees." (IER-036–37 (quoting *Chambers*, 501 U.S. at 35–40).)

This qualifies as an exceptional case riddled with "extreme egregious conduct" that would have allowed an award of all fees. As the district court remarked, "[i]f the bad acts committed in this case are not 'extreme circumstances,' the Court is unsure what would so qualify." (IER-056.) The court further commented that BurnsBarton attempted "to defile 'the very temple of justice'" and that the additional compensatory award was "due to the multiple findings of egregious conduct" on the part of BurnsBarton. (IER-041.)

The district court's middle-ground position between to-the-penny

accounting work and an "all fees" award (a "phase award," perhaps) is authorized by *Goodyear* and does not amount to an abuse of the court's considerable discretion here. As the Supreme Court emphasized:

> The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection. Accordingly, a district court may take into account its overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's superior understanding of the litigation, are entitled to substantial deference on appeal.

*Goodyear*, 137 S. Ct. at 1187 (cleaned up). That the district court chose to apportion specific amounts of the fee award further shows it engaged in careful decision-making here, not an "arbitrary doubling." (Intervenors' Br. at 12.)

Nothing about the court's mention of the process afforded to BurnsBarton changes this. The court never stated it was punishing BurnsBarton here, but rather specified the second award was "an additional compensatory award to Plaintiffs." (IER-041.) This Court must defer to its reasonable calculation of that award. And, in any event, "[e]ven if the district court's reasoning was faulty," this Court "may affirm the district court for any reason supported by the record." *United States v. Ortega-Ascanio*, 376 F.3d 879, 885 (9th Cir. 2004).

## IV. The Compensatory Damages Award

### A. Standard of review

"A district court's determination of damages in connection with a default judgment is reviewed for clear error." *Cutcliff v. Reuter*, 791 F.3d 875, 882 (8th Cir. 2015); *accord Rozario v. Richards*, 687 F. App'x 568, 569 (9th Cir. 2017).

### B. Legal standard

Following the entry of a default judgment, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The complaint is also entitled to "the benefit of all reasonable inferences therefrom, except where pertaining to damages." *Atias v. Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005); *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994). "[F]acts alleged to establish liability are binding upon the defaulting party," and the defendant may "not challenge the sufficiency of the evidence" supporting the plaintiff's claims. *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (citation omitted).

"If the court determines that the allegations in the complaint establish liability, it must next determine the amount and character of relief to award." *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 947 (D. Ariz. 2013) (cleaned up). "[B]road latitude is allowed in quantifying damages[.]" *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (citation omitted). "[D]oubts should be

resolved against the wrongdoer." *Id.*

The plaintiff has the burden to show damages here, but that "burden . . . is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default. Injury is established and plaintiff need only prove that the compensation sought relates to the damages that naturally flow from the injuries pled." *HTS, Inc.*, 954 F. Supp. 2d at 947 (cleaned up).

## C. ACS's causation arguments are not properly before this Court.

ACS essentially argues that Swisher failed to prove causation at the damages hearing. (*See* Appellant's Br. at 45–46.) But where the defendant "was in default and the district court correctly accepted the fact allegations of the complaint as true," that defendant's "causation arguments are not before [the appellate] court." *Stephenson v. El-Batrawi*, 524 F.3d 907, 915 n.9 (8th Cir. 2008).

That is the case here because Swisher's complaint pleaded proximate cause. It alleged that Defendants' wrongful conduct "caused Swisher substantial harm" and "[a]s a result of Defendants' [wrongful conduct], Swisher has been damaged, and continues to be damaged." (IER-555, 558; *see* IER-556, 559.) ACS claims "[t]he complaint does not allege that any of those twenty-six customers [at issue at the hearing] switched their business to Accurate *as a result* of the conduct alleged in the complaint." (Appellant's Br. at 46.) But that is not the inquiry,

and Swisher was not required to plead its allegations with particularity here.

In support of its argument, ACS cites *Roadrunner Transportation Services, Inc. v. Tarwater*, No. SACV-10-1534-AG-(MLGx), 2013 WL 12171729 (C.D. Cal. Aug. 9, 2013). *Roadrunner* is easily distinguishable because there, the complaint specifically alleged the defendant's conduct "caused Roadrunner to lose *four* customers." *Id.* at *2. Because the complaint limited the damages in this way, the court determined that including additional customers in the damages calculation would be tantamount to amending the complaint. *Id.* It would also violate Rule 55(c), which specifies: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

Here, by contrast, Swisher alleged that "Defendants wrongfully interfered with Swisher's contractual relationships and business expectancies by utilizing the Confidential Information that Defendant Clawson learned about during his employment with Plaintiffs." (IER-555; *see* IER-557–59.) The complaint did not limit Swisher's damages to any particular number of customers; to the contrary, it alleged that Defendants' conduct was ongoing and sought injunctive relief to limit the damages caused by their continuous actions. (IER-559.)

### D. The compensatory damages award was amply supported and not "speculative."

ACS argues "[t]he evidence presented at the damages hearing was too

speculative to support the District Court's finding that twenty-six customers left Swisher for Accurate as a result of the misconduct alleged in the complaint." (Appellant's Br. at 44.) But Swisher introduced ample evidence of its damages here and met its burden to show "the compensation sought relates to the damages that naturally flow from the injuries pled." *HTS, Inc.*, 954 F. Supp. 2d at 947 (citation omitted). The complaint pleaded injuries based on, among other things:

- Working with ACS, Clawson successfully solicited numerous Swisher employees, including Daniel Spring and Roger Perry, to join ACS while Clawson was still employed by Swisher. (IER-546, 550, 551.)

- Defendants' misconduct in having Clawson solicit Swisher employees in breach of his duty of loyalty "for the purpose of hiring them to bring to ACS the accounts of Swisher customers with whom such employees had developed professional relationships for the benefit of Swisher." (IER-546.)

- Defendant Clawson confirmed that Swisher employee Roger Perry, whom Clawson solicited on behalf of ACS, started soliciting Swisher customers while Perry was still employed by Swisher. (IER-552.)

- ACS "encouraged" the improperly recruited Swisher employees to "use their knowledge of Plaintiffs' confidential information to recruit additional Swisher employees" and customers. (IER-546.)

- Clawson's breach of his contractual and legal obligations to Swisher (and ACS's aiding and abetting thereof). (IER-557–58.)

- Clawson acknowledged Defendants took and used Swisher's confidential information, including its working capital calculator documents (which contained customer names, contact information, product and supply requirements, and a calculation of revenue each client would generate). And Defendants used Swisher's WCC as a starting point to identify customers to take from Swisher. (IER-547–48, 553, 557.)

- Defendants' utilized Swisher's confidential information for Defendants' benefit. (IER-555.)

While Clawson was still employed by Swisher, he and ACS recruited Swisher employees Roger Perry and Daniel Spring. (IER-551–52.) At the damages hearing, Swisher presented evidence showing they were "two of [Swisher's] best reps that worked in the southern California area." (2-AccurateER-134). Swisher showed that Perry and Spring were its lead contacts for twenty-six customers listed on Swisher's Rule 1006 Damages Summary, which was admitted into evidence. (IER-017–18; 2-AccurateER-132.) The court awarded damages only for those twenty-six customers and found Swisher had "not met its burden" with regard to other customers listed in the Damages Summary. (IER-018.) The court's analysis shows it considered the evidence presented and only awarded damages it found to be "the direct and natural result" of Defendants' misconduct. (*Id.* (citation omitted).) Swisher's evidence provides an adequate basis for the district court's compensatory damages award.

### E. The district court correctly sustained relevance objections to ACS's causation evidence.

Relatedly, ACS argues the district court abused its discretion by "sustaining improper relevance objections to testimony that would have further demonstrated the speculative nature of Swisher's damages claim." (Appellant's Br. at 48.) This Court "review[s] the district court's evidentiary rulings for an abuse of

discretion and will not reverse unless prejudice is shown." *Payne v. Norwest Corp.*, 185 F.3d 1068, 1072 (9th Cir. 1999). "A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008) (citation omitted).

In its brief, ACS discusses at length the evidence it would have presented at the hearing, but, as the district court noted, ACS did not make an offer of proof pursuant to Federal Rule of Evidence 103(a)(2). (IER-007.) "To preserve an issue for review requires an offer of proof and the making of a record." *United States v. Bagley*, 837 F.2d 371, 375 (9th Cir. 1988). ACS's counsel merely stated: "if given the opportunity, we would call some of the -- some other witnesses. But we don't have time to do that and do the other obligations that are being called upon us." (2-AccurateER-191–92.) This is insufficient "[b]ecause at no time did counsel identify the *content* of the evidence he sought to introduce." *United States v. Beraun-Panez*, 812 F.2d 578, 582 (9th Cir.) (emphasis added), *modified*, 830 F.2d 127 (9th Cir. 1987). The Court should therefore "decline to consider [ACS's] contention" here. *Id.*

ACS tried to present evidence allegedly showing Swisher's loss of customers to ACS (and damages flowing therefrom) was caused by something other than Defendants' misconduct alleged in the complaint. This was improper, as,

again, causation is presumed upon default. The district court correctly sustained Swisher's relevance objections and excluded this evidence. *See Adriana Int'l*, 913 F.2d at 1414 (affirming exclusion of evidence "related to the liability of [defaulted party], an issue that became irrelevant once the default judgment was entered"). Because it was irrelevant to the issue of damages, ACS cannot show prejudice from these rulings.

### F. The district court gave ACS sufficient time to present evidence at the damages hearing.

ACS also argues the district court "abused its discretion by imposing undue time restraints on Accurate's presentation of evidence . . . ." (Appellant's Br. at 48.) The district court rejected this argument, finding ACS was aware of the amount of time it would have well in advance and noting it "allowed ACS more time at the hearing than was previously ordered." (IER-009.) By failing to present any offer of proof, ACS failed to make a record of why it needed additional time or what evidence or testimony it might present if given time.

On May 14, 2020, the district court scheduled the evidentiary hearing on Swisher's motion for damages for July 7, 2020, from 9:00 AM until noon. (IER-042.) After Defendants sought clarification regarding the hearing's length, the court issued another order on July 2, stating:

> Plaintiffs will be allowed 60 minutes to present their evidence and witnesses as to damages, and Defendants Clawson and ACS will be allowed 30 minutes total for any rebuttal evidence. Each party will

be allowed 15 minutes for final summation of their arguments at the conclusion of the hearing. The parties may choose to use this 15 minutes for additional time to present evidence and forgo a closing summation.

(2-AccurateER-215; *see* 1-SER-2.) ACS did not file any objection to this order. Instead, it strategically waited five days to object "at the conclusion of the hearing to the lack of time allowed to present [its] additional witnesses"—not even at the beginning. (Appellant's Br. at 49.) This was too late; ACS forfeited this argument by "failing contemporaneously to object" to the court's order. *See McConnell v. Wal-Mart Stores, Inc.*, 650 F. App'x 520, 522 (9th Cir. 2016) (mem.).

Beyond that, defendants are not automatically entitled to a damages hearing *at all*. *Garden City Boxing Club, Inc. v. Aranda*, 384 F. App'x 688, 689 (9th Cir. 2010) (mem.). Rather, "the court 'may' conduct hearings when, to enter or effectuate default judgment, it needs to determine the amount of damages." *Id.* (quoting Fed. R. Civ. P. 55(b)(2)(B)). And the decision not to hold an evidentiary hearing in this context is reviewed only for abuse of discretion. *KPS & Assocs. v. Designs by FMC, Inc.*, 318 F.3d 1, 18 (1st Cir. 2003).

That discretion is even broader here, where ACS takes issue with the *manner* in which the hearing was conducted. As the district court noted, it is "well established that [it] has broad discretion to control its own docket." *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012); (IER-009). ACS fails to

identify a single case where a district court abused its discretion by limiting the time of evidence presentation. Instead, ACS cites an inapposite case in which a lower court failed to hold a hearing. (Appellant's Br. at 48.)

ACS complains that the district court gave it only thirty minutes to present evidence (and made it share that time with Clawson). First, ACS, as a defendant, did not have the burden of proof. Swisher did (and was also subject to short time constraints). Second, during the hearing, the court noted "counsel for [the] defense [had] used 28 minutes" and gave them "about an eight-minute leeway" to present further evidence. (2-AccurateER-157.) After that, the court gave them another "ten minutes for [their] last witness"—remarking, "[w]e've got a little bit of leeway here"—then clarified that the extra time was for "witness testimony" and stated, "I'm going to give you a little bit more leeway to make your summation." (2-AccurateER-171.)

Third, the court gave "each party" an additional fifteen minutes for a closing argument and the option "to use [it] for additional time to present evidence and forgo a closing summation." (2-AccurateER-215.) ACS chose not to do so and presented a closing instead. (2-AccurateER-198–203.) Thus, the district court did not abuse its discretion in setting these time constraints. It limited all parties' presentation of evidence and gave ACS extra time, more than once, during the hearing, including time that ACS did not even use for that purpose.

## V.    The Punitive Damages Award

### A.    Standard of review

"An award of punitive damages is subject to an abuse of discretion standard of review." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *Chambers v. Farm Workers Org. Comm.*, 541 P.2d 567, 571 (Ariz. Ct. App. 1975).

### B.    Arizona law on punitive damages

"The purpose of punitive damages is not to compensate the plaintiff, but to express society's disapproval of outrageous conduct and to deter such conduct by the defendant and others in the future." *Hawkins v. Allstate Ins. Co.*, 733 P.2d 1073, 1080 (Ariz. 1987). Here, "a plaintiff must prove by clear and convincing evidence that the defendant engaged in reprehensible conduct combined with an evil mind over and above that required for commission of a tort."[8] *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 454 (Ariz. Ct. App. 2015) (cleaned up). A plaintiff may satisfy this burden with direct, indirect, or circumstantial evidence. *Thompson*, 832 P.2d at 210.

"In determining whether a defendant acted with an evil mind, courts look, in part, at the nature of the defendant's conduct, including the reprehensibility

---

[8] "Clear and convincing evidence means that which may persuade that the truth of the contention is highly probable." *Thompson v. Better-Bilt Aluminum Prod. Co.*, 832 P.2d 203, 210 (Ariz. 1992) (cleaned up).

of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, the duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, **and any concealment of it**." *Thompson*, 832 P.2d at 209 (emphasis added) (cleaned up). While punitive damages are not available in all cases, "if a party has pursued a course of conduct knowing that it created a substantial risk of significant harm to others and its conduct was guided by evil motives, punitive damages should be available to punish such behavior." *Medasys Acquisition Corp. v. SDMS, P.C.*, 55 P.3d 763, 767 (Ariz. 2002) (cleaned up).

### C. The record contains ample support for the punitive damages award.

ACS claims there is "no evidence" to support the award of punitive damages. (Appellant's Br. at 58.) This is easily refuted by the record. Arizona law does not impose a rigorous standard for establishing when punitive damages are warranted in the context of a default judgment. Instead, it merely requires that "the amount of punitive damages awarded must find some reasonable support in the record even when judgment is entered by default." *Marriage of Kline v.*

*Kline*, 212 P.3d 902, 910 (Ariz. Ct. App. 2009).[9] This does not limit the district court's consideration to only evidence presented at a damages hearing.

The record here was well developed when the district court awarded punitive damages. Witnesses, including Clawson and Zall, had testified under oath at evidentiary hearings, summary judgment briefs (with numerous exhibits and deposition transcripts) had been filed and considered, and the parties had presented substantial documentary evidence related to Swisher's motions for sanctions. The court had already issued several orders making detailed factual findings of misconduct on the part of Defendants and their attorneys. (IER-024–042, 043–063, 064–093.)

The district court based its punitive damages award primarily on the following conduct:

> Defendants' actions of stealing Swisher's proprietary information for use by ACS were done "with an evil mind with intent to injure Plaintiffs." What is more, the theft of confidential information did injure Plaintiffs financially. Both Clawson's and ACS's conduct was done with the intent to financially enrich ACS to the detriment of Swisher. It is established that Clawson knowingly and willfully

---

[9] Most of the cases cited by ACS here do not involve Arizona law and are thus inapposite. (Appellant's Br. at 54–56); *see Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1205 (5th Cir. 1996) (Texas law); *Alutiiq Int'l Sols., LLC v. OIC Marianas Ins. Corp.*, 149 F. Supp. 3d 1208, 1215 (D. Nev. 2016) (citing *Gober* and Nevada law); *see also Hawks v. Seery*, No. CV-21-00092-PHX-DGC, 2021 WL 2209045, at *2–3 (D. Ariz. June 1, 2021) (citing a California federal case, a Second Circuit case, and *Alutiiq*); *HTS, Inc.*, 954 F. Supp. 2d at 947 (citing federal caselaw).

> misappropriated Swisher's confidential working calculator documents to ACS with ACS's knowledge and consent, and that ACS utilized those documents to lure Swisher customers. It has also been established that Clawson's and ACS's actions gave ACS an advantage in the market to the detriment of Swisher.

(IER-020 (cleaned up).) This conduct has considerably more than "some reasonable support in the record." First, the Action Plans evidenced a complex, premeditated scheme of corporate raiding by Clawson and ACS, identifying well over 100 Swisher customers and containing a raft of confidential business information that Clawson weaponized to take as many Swisher customers and employees as possible. Clawson testified that he "identified 100 or more Swisher customers" to Zall, "estimated monthly revenue" for them, and "included on both plans a section about bringing over from Swisher certain Swisher employees." (IER-630, 636.) He also confirmed he drafted the Action Plans at Zall's direction. (IER-648–50.)

Swisher submitted the following evidence in opposition to Clawson's motion for summary judgment:

- "[Former General Sales Manager of ACS Kevin] Peterson testified under oath that Defendant Clawson had confessed that he: (1) had taken Swisher's confidential customer pricing information on a flash drive, and (2) went to extraordinary lengths to conceal his misconduct." (1-SER-206–10.)

- "Clawson confessed to Tony Khoury that he and ACS had engaged in a months' long scheme to raid Swisher's employees and to induce them to join ACS." (1-SER-215.)

- "Clawson admitted that, while he was still employed with Swisher, he 'orchestrated' the upcoming departures of numerous employees." (1-SER-215.)

- "Clawson also told Khoury that he had taken all of the working capital calculator document[s] and . . . he and ACS were using them as a starting point to identify customers to take from Swisher." (*Id.* (cleaned up).)

Thus, Swisher filed substantial amounts of evidence beforehand that provided "reasonable support" for the punitive damages award.

ACS also claims the district court "improperly relied on Clawson's alleged breach of his employee non-solicitation agreement" because it "expressly acknowledge[ed] that the nonsolicitation agreement was invalid as a matter of law." (Appellant's Br. at 57.) But much of the same conduct also constituted a breach of Clawson's fiduciary duty and duty of loyalty, as Clawson began recruiting Swisher employees to ACS while still employed by Swisher. That claim is part of the default judgment against Defendants.

What's more, this was probative circumstantial evidence of an "evil mind." Clawson obviously did not know when he breached the terms of the employee nonsolicitation covenant that it would eventually be held unenforceable. His actions in blatant violation of the covenant's terms show that Clawson was "consciously aware of the wrongfulness or harmfulness of his conduct and yet continue[d] to act in the same manner in deliberate contravention to the [Swisher's] rights." *Thompson*, 832 P.2d at 209 (cleaned up). That Clawson

repeatedly engaged in other misconduct evidencing an intent to harm Swisher makes it more likely that he acted with the requisite mental state. *See Hawkins*, 733 P.2d at 1080 ("[T]he requisite evil mind may be inferred if the insured's conduct is sufficiently oppressive, outrageous or intolerable." (cleaned up)).

Arizona courts have authorized punitive damages for less egregious conduct than what occurred in this case. In *Security Title Agency, Inc. v. Pope*, an office manager, while still employed by the plaintiff, solicited numerous employees to join the defendant competitor. 200 P.3d 977, 982 (Ariz. Ct. App. 2009). The plaintiff prevailed on its claim against the competitor for aiding and abetting breach of fiduciary duty, and the appellate court held the competitor's conduct "sufficiently reprehensible to justify an award of punitive damages" of over six million dollars. *Id.* at 503, 506.

The *Pope* court relied in part on this Court's decision in *American Republic Insurance Co. v. Union Fidelity Life Insurance Co.*, 470 F.2d 820 (9th Cir. 1972), another wrongful solicitation case. There, an area manager for the plaintiff persuaded several of its employees to join him at Union, and once there, he used customer leads generated while at his former employer. *Id.* at 823. This Court found Union "was a party to the illegal actions of Lindgren" because Union knew Lindgren was recruiting the plaintiff's employees while he was employed by plaintiff, knew he was using the other company's customer leads, took no

actions to prevent Lindgren's wrongful conduct, and benefited from those wrongful acts. *Id.* at 823–26. Applying Oregon law, the Court upheld an award of punitive damages because "[t]he evidence was that Union acted in willful, wanton and reckless disregard of" the plaintiff's rights. *Id.* at 826.

Clawson's fiduciary breaches, his use of Swisher's confidential information, and ACS's aiding and abetting of such misconduct amply justify the two-to-one award of punitive damages here. The reprehensible nature of the Defendants' conduct far exceeds anything in either *Pope* or *American Republic* because unlike those cases, Defendants also engaged in pervasive and serious litigation misconduct, including submitting false testimony that prejudiced Swisher and spoliating "critical evidence" that went "to the heart of [its] claims." (IER-077.) The district court found clear and convincing evidence of this misconduct. (IER-085.) As discussed below, this was relevant evidence of Defendants' "evil mind" and concealment of their misconduct.

### D. The district court based the punitive damages award solely on Defendants' relevant misconduct.

ACS asserts the district court "improperly relied on its prior findings that Clawson and BurnsBarton engaged in litigation misconduct to support an award of punitive damages." (Appellant's Br. at 58.) This is incorrect. For starters, there is no indication whatsoever that the punitive damages award stemmed from BurnsBarton's misconduct. In the section of its order addressing "Punitive

Damages," the court focused on Defendants' misconduct and did not mention anyone associated with BurnsBarton once. (IER-019–21.) In any event, as discussed above, Defendants and their counsel acted in concert in committing this misconduct.

As for Defendants' litigation misconduct, it was directly relevant to the punitive damages award. The Arizona Supreme Court has instructed courts to consider "any concealment" of the relevant misconduct "in judging the reprehensibility of the defendant's conduct." *Hawkins*, 733 P.2d at 1080. Lying in a sworn affidavit about soliciting Swisher's customers, identifying them to ACS, and using Swisher's confidential information, and then destroying evidence of this conduct were both efforts to conceal actions relating directly to Swisher's claims. Clawson's other misconduct provides circumstantial evidence that he acted with an "evil mind" when committing the misconduct at issue in the punitive damages award.

The district court also made clear its primary basis for awarding punitive damages was Defendants' misconduct related to Swisher's claims. It stated: "*Separate and apart from the litigation misconduct* that occurred in this case, there are numerous findings related to the egregious conduct of Defendants that gave rise to the conduct alleged in the Complaint." (IER-020 (emphasis added).) The litigation misconduct merely bolsters the punitive damages award even more.

To the extent ACS argues the district court erred in finding it vicariously liable for Clawson's conduct that supported the punitive damages award, that argument is discussed above. And Arizona law makes clear that "a principal may be held responsible for punitive damages for the conduct of its agent without any showing of the principal's mental state." *McClure v. Country Life Ins. Co.*, 326 F. Supp. 3d 934, 948 (D. Ariz. 2018); *see Haralson v. Fisher Surveying, Inc.*, 31 P.3d 114, 119–20 (Ariz. 2001) (punitive damages may be awarded against employer for acts of employee "so long as committed in furtherance of employer's business" and "within scope of employment" (cleaned up)). Moreover, ACS itself committed independent actions that justify the award, like directing and encouraging Clawson to engage in his misconduct and knowingly filing a false affidavit.

ACS also claims the district court improperly "triple dip[ped]" by awarding punitive damages, attorney's fees, and case-ending sanctions based on the same conduct. (Appellant's Br. at 58.) But ACS cites no authority in support of its argument that these three rulings were somehow improper simply because they occurred in the same case. Awards of punitive damages and attorney's fees serve different purposes. ACS complains that the former was "extra-compensatory," but that is precisely the point. (*Id.* at 59–60.) "The purpose of punitive damages is not to compensate the plaintiff, but to express society's disapproval

of outrageous conduct and to deter such conduct by the defendant and others in the future." *Hawkins*, 733 P.2d at 1080. Attorney's fees, on the other hand, are compensatory in nature, as ACS has repeatedly argued.

Finally, as the district court made abundantly clear, it imposed the default judgment because of Defendants' litigation misconduct, and the punitive damages primarily because of their egregious, tortious actions that harmed Swisher's business. This is an extraordinary case because of the serious and pervasive misconduct committed by Defendants and their counsel. "That a party perceives itself disadvantaged by the consequences of its own misconduct or that of its agent does not mean that the district court acted inappropriately." *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1200 (10th Cir. 2021).[10]

## Conclusion

For the reasons discussed above, the Court should affirm the district court's judgment and award Swisher its attorney's fees and costs incurred on appeal.

Filed: December 8, 2021.

Respectfully submitted,

---

[10] The district court denied ACS's motion to alter or amend judgment or for a new trial. (IER-010.) ACS nominally challenges this ruling as well, which is reviewed for abuse of discretion. *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam); (Appellant's Br. at 20). This ruling should be affirmed for the reasons discussed above.

SWISHER HYGIENE FRANCHISE
CORP.; SWISHER HYGIENE INC.;
SWISHER INTERNATIONAL, INC.,
*By Counsel*

By s/Benjamin S. Morrell

Pavneet Singh Uppal
Kris Leonhardt
FISHER & PHILLIPS, LLP
3200 N. Central Avenue
Suite 1550
Phoenix, AZ 85012
(602) 281-3400
puppal@fisherphillips.com
kleonhardt@fisherphillips.com

Benjamin S. Morrell
FISHER & PHILLIPS, LLP
227 West Trade Street
Suite 2020
Charlotte, NC 28202
(704) 334-4565
bmorrell@fisherphillips.com

*Counsel for Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-16727, 21-15928

I am the attorney or self-represented party.

**This brief contains** | 15,339 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　◉ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Benjamin S. Morrell | **Date** | 12/09/2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** 　　　　70　　　　 *Rev. 12/01/2018*

# Certificate of Service

I certify that on the date listed below, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: December 9, 2021.

By s/Benjamin S. Morrell
Pavneet Singh Uppal
Kris Leonhardt
FISHER & PHILLIPS, LLP
3200 N. Central Avenue
Suite 1550
Phoenix, AZ 85012
(602) 281-3400
puppal@fisherphillips.com
kleonhardt@fisherphillips.com

Benjamin S. Morrell
FISHER & PHILLIPS, LLP
227 West Trade Street
Suite 2020
Charlotte, NC 28202
(704) 334-4565
bmorrell@fisherphillips.com

*Counsel for Appellees*